Filed 11/22/23  Ilaga v. The Permanente Medical Group CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| HENRY ILAGA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE PERMANENTE MEDICAL GROUP, INC., et al.,<br><br>    Defendants and Respondents. | A165273<br><br>(Alameda County<br>Super. Ct. No. RG19009039) |

In this employment action, plaintiff and appellant Henry Ilaga (plaintiff) appeals following the trial court's grant of a motion for summary judgment filed by defendants and respondents The Permanente Medical Group, Inc. and Monica Azevedo (defendants).  We reverse as to plaintiff's causes of action for age discrimination and for failure to prevent age discrimination, both under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et. seq), as well as to plaintiff's request for punitive damages, but we otherwise affirm.

1

BACKGROUND[1]

Plaintiff, born May 1958, worked for defendant The Permanente Medical Group, Inc. (Permanente) for over 26 years, starting in 1991. Permanente consists of 19 service areas throughout Northern California, including the Central Valley Service Area (CVSA), which provides healthcare services in Stockton, Modesto, Tracy, and Manteca. In 2011, plaintiff was promoted to the position of Director of Strategic Business and Development for the CVSA. In that position, he "managed space and expansion projects, including their design, planning, and implementation, and strategic development and planning of capital expansion initiatives." As Director, plaintiff reported to the Medical Group Administrator, who in turn reported to the Physician-in-Chief, who was the top executive in the CVSA. Starting in October 2015, the Physician-in-Chief in the CVSA was Sanjay Marwaha, M.D. (Dr. Marwaha). Prior to June 2016, the Medical Group Administrator was Linda Mann. In June 2016, Dr. Marwaha made defendant Azevedo the Medical Group Administrator, and she remained in that position until February 2019.

In March 2016, plaintiff received a very positive performance evaluation for 2015 from Ms. Mann, with an overall rating of "Excellent Performance." In or around March 2017, Ms. Azevedo gave plaintiff his performance evaluation for 2016. Plaintiff averred, "It was the worst performance evaluation of my career." Among other things, in the category,

---

[1] "On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) Our factual summary reflects that standard of review. (*San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.* (2014) 224 Cal.App.4th 627, 632, fn. 4.)

"Drives for Results," Ms. Azevedo wrote, "[a]n area of opportunity for [plaintiff] is to improve his deliverable timing understanding that Dr. Marwaha and I require sufficient time to review materials, ask clarifying questions and ensure alignment well in advance of deadlines." In contrast, Ms. Mann had written in his 2015 performance evaluation, "[Plaintiff] is relentless in moving projects and ideas forward and achieving results. . . . I would commend [plaintiff] for his diligence and persistence in moving our . . . partners to outcomes and results."

In a declaration, plaintiff disputed Ms. Azevedo's statements in the 2016 performance evaluation. He averred, "I was prepared for all meetings during my career as Director of Strategic Business and Development for [Permanente]. I consistently was able to provide additional information and to answer follow up questions asked by regional leaders when attending meetings with them."[2]

On or around October 31, 2017, plaintiff attended a meeting with Ms. Azevedo in her office. To his surprise, a human resources consultant was also present; Ms. Azevedo stated that the consultant was there to witness and document the meeting. In a declaration, plaintiff described the meeting as follows: "[Ms.] Azevedo proceeded to say that my work product required extensive time for her to review. I told her that this was the first time I was hearing of her concerns and that I would have expected her to reach out and dialogue with me on her questions or need for clarity. In addition, I expressed that the workload had increased with the growth and demand for additional space, and because I had not received a replacement for my former

---

[2] Plaintiff's declaration is further detailed in our discussion of the merits.

3

Project Manager, Mark Azevedo,[3] despite my request. Although I asked if we could have a conversation about her concerns, [Ms.] Azevedo told me that I was being moved to a different position. It was clear to me that this was a demotion, because I was moved to a smaller office, I no longer directly reported to [Ms.] Azevedo, I lost the staff that reported directly to me . . ., and the salary band for the demoted position was about $20,000 less than that of my Director position. It was also clear to me that I could not trust [Ms.] Azevedo as she was demoting me based on fabricated reasons."

Ms. Azevedo changed the name of the "Strategic Business and Development" team to the "Space and Capital Planning" team. The Space and Capital Planning team had the same employees, objectives, and work as the Strategic Business and Development team. In November 2017, Ms. Azevedo informed plaintiff that he would be reporting to Ann Vales, an employee whom plaintiff had trained and who was "significantly younger and less experienced" than he. She was named Director of the team, and plaintiff was given the new title, "Practice Specialist." The new position had a lower salary range and plaintiff was moved to a smaller office outside the executive suite; previously his office had been next to Dr. Marwaha's and Ms. Azevedo's offices, who were the two most senior executives in the CVSA.

Plaintiff, who was 59 years old at the time, believed he had been discriminated against in the demotion. He averred, "After approximately twenty-six (26) years at [Permanente], I was shocked, confused, disoriented, and dumbfounded by my sudden demotion and the promotion of a younger and less experienced employee whom I had trained to take over my role and become my supervisor. I was humiliated. After my demotion, I struggled in the environment created by [Ms.] Azevedo. Based on my experience working

---

[3] Mark Azevedo is Ms. Azevedo's husband.

4

with [Ms.] Azevedo and observing the way she treated older people and minorities with less respect than younger Caucasian people, I believe that my demotion was related to my age and race.[4] I also believe that [Ms.] Vales' promotion was related to her being younger than me and being Caucasian. My demotion and [Ms.] Vales' promotion were consistent with my observations that [Ms.] Azevedo gave preferential treatment to younger Caucasian people. Based on [Ms.] Azevedo's treatment of other employees who had been forced out, after her false accusations of my performance issues and my illegitimate demotion, I believed I was being forced out."

Although plaintiff had intended to remain at Permanente until his retirement, he instead resigned a few months after his demotion, in February 2018. He averred, "During the time that [Ms.] Azevedo was the [Medical Group Administrator], [she] created an environment in which I eventually realized I could not continue to work as my employment conditions became intolerable."

In March 2019, plaintiff filed suit against defendants. The complaint alleged ten causes of action: (1) race discrimination under the FEHA, (2) age discrimination under the FEHA, (3) harassment because of race and age under the FEHA, (4) race and age associational discrimination under the FEHA, (5) failure to prevent discrimination and harassment under the FEHA, (6) retaliation under the FEHA,[5] (7) wrongful constructive termination in violation of public policy, (8) intentional infliction of emotional distress (IIED), (9) breach of express or implied contract, and (10) breach of the implied covenant of good faith and fair dealing. Among other things, the

---

[4] Plaintiff is Asian-American, of Filipino ethnicity.

[5] The retaliation claim was on behalf of a second named plaintiff who is not involved in the present appeal.

5

complaint requested injunctive relief, damages for economic harm and emotional distress, and punitive damages.

In July 2021, defendants moved for summary judgment or, in the alternative, summary adjudication. Defendants contended that plaintiff had accepted a voluntary transfer during a corporate reorganization and then voluntarily resigned. Ms. Azevedo averred in a declaration that, when she became Medical Group Administrator, "it was [her] good faith belief [plaintiff] was not providing sufficient leadership or delivering work product necessary to accomplish space and capital projects for the service area." Defendants also submitted a declaration from Dr. Marwaha making similar assertions about plaintiff's preparedness.[6]

Plaintiff filed an opposition to defendants' motion for summary judgment. The opposition was supported by plaintiff's declaration, which disputed the assertions in Ms. Azevedo's and Dr. Marwaha's declarations. Plaintiff's opposition was also supported by declarations from a number of former Permanente employees, and deposition testimony from a current employee. Some of those persons contradicted defendants' allegations about plaintiff's work performance and some averred they had observed Ms. Azevedo engage in age discrimination.

In November 2021, the trial court granted defendants' motion for summary judgment. On the discrimination claim, the court concluded plaintiff had not shown the existence of a triable issue as to whether he suffered an adverse action; the court's decision also stated, without explanation, that plaintiff had not presented evidence creating a triable issue as to whether the reasons for any adverse action were pretextual. On the

---

[6] Ms. Azevedo's and Dr. Marwaha's declarations are further detailed in our discussion of the merits.

harassment claim, the court concluded, among other things, that the complained-of actions were personnel decisions that could not provide a basis for the claim. The trial court also concluded plaintiff did not show there was a triable issue as to whether the conditions were so intolerable as to constitute constructive termination. The court granted defendants' motion as to plaintiff's other causes of action because the claims were derivative or duplicative of the discrimination or harassment claims, or because plaintiff did not oppose the motion as to particular claims. Finally, the court stated it was unnecessary to address defendants' motion as to the request for punitive damages because it was granting summary adjudication of all of plaintiff's claims.

In February 2022, after reconsideration, the trial court reaffirmed its order granting the defendants' motion for summary judgment. The present appeal followed.[7]

DISCUSSION

I.    *Standard of Review*

" ' "A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,' " the elements of his or her cause of action. [Citation.]' [Citation.] We review the trial court's decision de novo, liberally

_____

[7] An order granting a defendant's summary judgment motion is not an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(1); *Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 761, fn. 7.) In the present case, the parties agree no judgment appears in the record. "In the interests of justice and to avoid delay, we construe the order granting summary judgment as incorporating an appealable judgment, and the notice of appeal as appealing from such judgment." (*Levy*, at p. 761, fn. 7.)

7

construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017–1018.)

II.     *The Trial Court Erred in Granting Summary Adjudication of Plaintiff's Age Discrimination Claim*

     A.     *Legal Background*

The FEHA makes it unlawful to "discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" because of age. (Gov. Code, § 12940, subd. (a).) " 'California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination. . . .' [Citation.] [¶] 'This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' [Citation.] [¶] In the first stage, the plaintiff bears the burden to establish a prima face case of discrimination. [Citation.] The burden in this stage is ' "not onerous" ' [citation], and the evidence necessary to satisfy it is minimal [citation]. . . . If the plaintiff meets this burden, ' " 'the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision. . . .' . . ." ' [Citation.] This likewise is not an onerous burden [citation], and is generally met by presenting admissible evidence showing the defendant's reason for its employment decision [citation]. [¶] Finally, if the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her. [Citation.] The plaintiff may

8

satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination." (*Wills v. Superior Ct.* (2011) 195 Cal.App.4th 143, 159–160 (*Wills*).)

"A defendant's summary judgment motion ' "slightly modifies the order of these [*McDonnell Douglas*] showings." ' [Citation.] [The defendant has] the initial burden to either (1) negate an essential element of [the plaintiff's] prima face case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the challenged adverse action] [citation]. [¶] '[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' " (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

B.   *Plaintiff Showed a Triable Issue as to Whether He Suffered an Adverse Action*

"In the context of the present case, a reasonable inference, that is, a prima facie case, of age discrimination arises when the employee shows (1) at the time of the adverse action he . . . was 40 years of age or older, (2) an adverse employment action was taken against the employee, (3) at the time of the adverse action the employee was satisfactorily performing his . . . job and (4) the employee was replaced in his position by a significantly younger person." (*Hersant v. Dep't of Soc. Servs.* (1997) 57 Cal.App.4th 997, 1003 (*Hersant*).) Of those elements, defendants only dispute that plaintiff has shown he suffered an adverse employment action. That is, defendants do not

9

dispute that plaintiff was over the age of 40, that there was evidence he was satisfactorily performing his job sufficient to satisfy his initial burden, or that his replacement Ms. Vales was significantly younger.[8]

In *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1051 (*Yanowitz*), the California Supreme Court defined an adverse action as one that "materially affects the terms, conditions, or privileges of employment." *Yanowitz* emphasized that the FEHA "protects an employee against unlawful discrimination with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career. Although a mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment . . ., the phrase . . . must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Yanowitz*, at pp. 1053–1054; accord, *Horsford v. Bd. of Trustees of California State Univ.* (2005) 132 Cal.App.4th 359, 373 [following *Yanowitz* in a discrimination case].)

Plaintiff demonstrates a triable issue as to whether the change in his employment position was an adverse action. At the outset, we observe that defendants repeatedly assert that plaintiff "accepted a new position." However, plaintiff averred that, at the October 2017 meeting, "[Ms.] Azevedo told me that I was being moved to a different position." Ms. Azevedo averred the position was "offered" to plaintiff and he "accepted." But the human

---

[8] Ms. Vales is almost 12 years younger than plaintiff.

10

resources representative who was at the meeting averred only that Ms. Azevedo told plaintiff "a change could be occurring." That language does not imply choice on plaintiff's part. Plaintiff's view is further supported by the circumstance that he soon started looking for a new job outside the company; a reasonable trier of fact could infer he would not have done so if he voluntarily accepted the new position. Plainly, there is a factual dispute as to whether the change was voluntary.

On the substance of the adverse action question, two organizational charts attached to plaintiff's declaration alone create a triable issue as to whether plaintiff was demoted. The first chart, from *before* the change, shows Dr. Marwaha at the top, then Ms. Azevedo at the next level, and then plaintiff and nine others at the third level on the chart. The second chart, *after* the change in position, shows Ms. Vales at the third level in the position of Director, where plaintiff previously was, and it shows plaintiff at the next level *below* her, listed without a title along with two others as a member of the "Space and Planning Capital Team."[9] And evidence from which a reasonable trier of fact could conclude that plaintiff was demoted is arguably sufficient to show a triable issue as to whether plaintiff suffered an adverse action. (See *Yanowitz, supra*, 36 Cal.4th at p. 1054 [characterizing "demotion" as an "ultimate employment action[]"]; *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*) [plaintiff must show "he suffered an adverse employment action, such as termination, demotion, or denial of an available job"]; CACI No. 2509 ["Adverse employment actions are not limited to

_____

[9] Ms. Vales, plaintiff's supervisor after the change in position, testified in her deposition that she viewed the change as a demotion of plaintiff. She explained that, as an "independent contributor" rather than a "director," plaintiff no longer had staff reporting to him and instead he and the other staff reported to her.

11

ultimate actions such as termination or demotion"].)[10]  However, we need not so decide, because plaintiff also showed his terms and conditions of employment were materially affected by the demotion.

In particular, the demotion moved plaintiff out of an executive and managerial role, which a reasonable trier of fact could conclude materially affected his "opportunity for advancement in his . . . career."  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1054.)  For example, prior to the transfer, plaintiff's title was "Director, Strategic Business and Development" for the CVSA.  After the transfer, his title was changed to "Practice Specialist."  A reasonable trier of fact could conclude that was a significantly less prestigious title that could affect his opportunities both within and outside the company.  (Cf. *McRae v. Dep't of Corr. & Rehab.* (2006) 142 Cal.App.4th 377, 393 [emphasizing that a "transfer" "did not involve a change in status or a less distinguished title"].)

Plaintiff also averred in his declaration that, "Prior to my demotion, my office was located in the C Suites, which housed employees in executive positions.  My office was right next to the offices of the Physician in Chief, Dr. Marwaha, and the [Medical Group Administrator], [Ms.] Azevedo.  When I was demoted, . . . [m]y office was tucked away, hidden, and not located close to any of the leaders with whom I worked."  Defendants argue the office move was merely "less desirable" to plaintiff.  We do not conclude a change in office location alone is sufficient to establish an adverse action.  Nevertheless, given "the realities of the workplace" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1054), a reasonable trier of fact could conclude that plaintiff's move out of the office

---

[10] Defendants do not argue to the contrary.  Instead, despite all the evidence to the contrary, they suggest the change in position was merely a lateral "transfer."  Indeed, defendants entirely ignore the organizational charts showing that the change was a demotion.

area for top management could affect how he was perceived and his opportunities for further advancement. Thus, the office change tends to support a conclusion that plaintiff suffered an adverse action in the totality of the circumstances. (*Id.* at p. 1052, fn. 11 ["it is appropriate to consider plaintiff's allegations collectively under a totality-of-the circumstances approach"].)

Plaintiff also averred, "the salary band for the demoted position was about $20,000 less than that of my Director position." Defendants argue "he cites no evidence for his claim." But defendants cite no authority plaintiff was incompetent to testify regarding the salary band applicable to his own position, and defendants cite no evidence contrary to plaintiff's averment, despite the ready availability of that information to them. The evidence that plaintiff's salary prospects were worse after his transfer is further evidence supporting a finding that the change in position was an adverse action.

In sum, there is evidence from which a reasonable trier of fact could infer that plaintiff was demoted into a position with less prestige and potential for financial and professional advancement. That is sufficient to show the change "materially affect[ed] the terms and conditions of employment." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1036.) Accordingly, plaintiff has shown there is a triable issue of fact as to whether he suffered an adverse action.[11]

---

[11] Plaintiff also argues he was constructively discharged, which constituted a second adverse action. We conclude later in this decision (*post*, Part III) that plaintiff has not shown a triable issue as to constructive discharge.

13

C.     *Respondent Offered Legitimate, Nondiscriminatory Reasons for*
       *the Demotion*

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Guz, supra,* 24 Cal.4th at p. 355.) "[T]he burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise [ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355–356.) " '[L]egitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*." (*Id.* at p. 358.)

Here, defendants argue, "By October 2017, [Ms.] Azevedo concluded that [plaintiff] could not properly manage his capital improvement projects [citations], and Dr. Marwaha . . . came to a similar conclusion based on their communications in which [plaintiff] appeared unprepared." Defendants continue, "[Ms.] Azevedo and Dr. Marwaha determined that it was best for operational efficiency to reorganize the capital improvement resources and staff and to create a new Space and Capital Planning Team. [Citation.] They created and offered to [plaintiff] a new Practice Specialist position on that new team."

Defendants' argument is supported by declarations submitted below from Ms. Azevedo and Dr. Marwaha stating concerns about plaintiff's preparedness. Ms. Azevedo averred, "I believed [plaintiff] was unprepared to present progress and assessment reports to regional leaders to make the business case for approval to move forward with projects; thus, capital projects were delayed until such information was prepared and reported in the next business approval cycle. The capital planning process requires specific attention to details and is very paper-heavy; concerns existed

14

regarding [plaintiff's] ability to complete projections, to be thorough and accurate in his analyses, and to be timely in submittal of paperwork."

Similarly, Dr. Marwaha averred, "I observed what I believed were significant deficiencies with [plaintiff's] handling his position. I had numerous communications with [plaintiff] in which he did not appear prepared to me or having a good handle on the capital improvement projects and issues for which he was responsible. By October of 2017 I had reached the conclusion [plaintiff] was not well suited to continue in the Director of Strategic Business Development position. Ms. Azevedo shared similar concerns to me about [plaintiff's] performance. Ms. Azevedo recommended restructuring the capital department and suggested that [plaintiff] be assigned to a new role where he could succeed. I agreed with Ms. Azevedo's recommendation. As a result of this reorganization, [plaintiff] was asked to transfer to a newly created Project Specialist position."

As noted previously, an employer's burden of articulating a legitimate, nondiscriminatory reason for its employment action is not "onerous" and "is generally met by presenting admissible evidence showing the defendant's reason for its employment decision." (*Wills*, *supra*, 195 Cal.App.4th at p. 160.) The averments in the Azevedo and Marwaha declarations are sufficient to satisfy defendants' burden; plaintiff does not argue to the contrary.

D. *Plaintiff Showed There is a Triable Issue as to Pretext*

"In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, ' "[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee]

15

must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for the [asserted] nondiscriminatory reasons.' " ' " (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 314 (*Sandell*).)

As Dr. Marwaha admitted, the "new" department established under Ms. Vales does "the same work as the Strategic Business and Development Department for which [plaintiff] was the director." Defendants do not dispute the point on appeal, stating that plaintiff's "new Team had the same objectives and did the same work as his former Team" and "his new position was not a change in subject matter and thus was comparable to his former position." The only evidence of change in plaintiff's job duties is that he no longer supervised two people who, after the demotion, were at the same level as him on the organizational chart. But defendants did not identify any issues with plaintiff's supervisory skills as a reason for his demotion. That defendants claim to have been concerned about plaintiff's work but assigned him substantially the same work after his demotion is evidence a reasonable trier of fact could find tends to support an inference of pretext.

Next, plaintiff points out that his 2015 evaluation under his prior supervisor, Ms. Mann, does not reflect any of the concerns about preparedness given as the reason for the demotion. In that evaluation, Ms. Mann rated plaintiff's overall performance as "excellent" and wrote, "[Plaintiff's] perseverance and ability to engage and collaborate brings many teammates into the fold of the work he is accountable for. It has been such an honor to have worked closely again with him this past year. He has unlimited potential as a leader and serves a critical role in the senior

16

leadership team!" Although plaintiff did not accomplish all of the 2015 project goals, Ms. Mann did not suggest plaintiff's preparedness was a problem, commenting only, "For 2016 I suggest keeping this goal and focus area with specific and measurable actions you can drive." Elsewhere, the supervisor emphasized plaintiff's ability to move projects forward, writing, "[Plaintiff] is truly a driver. He is relentless in moving projects and ideas forward and achieving results. . . One of his comments in his survey aptly described [plaintiff] as a leader that doesn't take no for an answer, but does so with positive persistence." Ms. Mann also commented, "[Plaintiff] definitely assumes ownership and delivers as promised. He produces an amazing amount of work and somehow consistently is able to meet deliverables and deadlines. . . [Plaintiff's] ability to engender trust, combined with his integrity, creates a leadership strength that gets things done through and with others." The 2015 evaluation also contains additional effusive comments about plaintiff.

Plaintiff's 2016 evaluation by Ms. Azevedo contrasts sharply, which both offers some support for defendants' reasons for the demotion but also suggests a need for an explanation for the difference in the evaluations. Ms. Azevedo's overall rating was "successful" and she commented, "As a Director and member of the Executive Administrative Leadership Team, the expectation of [plaintiff] is that he become more proactive in his approach to strategy and financial performance. It is critical to the future growth of the Central Valley that he present well vetted proposals to meet the current demands for space including the potential barriers as well as a forward thinking strategy to promote the needs of the Central Valley to Regional leaders. While I can appreciate [plaintiff's] collaborative style, he will need to exercise more independent judgment in advance of presenting proposals to

17

leadership to be able to answer questions instead of seeking input. I would encourage [plaintiff] to utilize his administrative support to help in the organization of his work to meet deliverables and timeline expectations." Although the 2016 evaluation echoes some of the reasons given for plaintiff's demotion, defendants offer no explanation for the dramatic difference from the prior year's evaluation, which expressed none of the same concerns.[12] Also, defendants cite to no documentary evidence (other than the 2016 evaluation) or other declarations supporting Ms. Azevedo's and Dr. Marwaha's assertions. Finally, a reasonable trier of fact could conclude the 2016 evaluation itself was tainted by Ms. Azevedo's alleged age bias. (*Sandell*, *supra*, 188 Cal.App.4th at p. 316 ["in light of the fact that [the supervisor's] complaints about [the plaintiff's] performance were often subjective, one could reasonably infer that these complaints, and the negative performance evaluation, were themselves motivated by discriminatory animus"].)

As further evidence of pretext, plaintiff points to declarations and testimony from three co-workers who express views contrary to defendants' concerns. Leticia Piazza Hopp averred in a declaration that plaintiff was "a high performer," "very productive," "insightful, competent, and . . . always

---

[12] As plaintiff points out, the wording of Ms. Azevedo's declaration suggests she "had already made up her mind against [plaintiff] from the time she became manager." She averred, "*When I became MGA* in 2016, [plaintiff] had been a long-time employee but it was my good faith belief he was not providing sufficient leadership or delivering work product necessary to accomplish space and capital projects for the service area." (Italics added.) She also averred that "*At the time I became the MGA* . . . I believed [plaintiff] was unprepared to present progress and assessment reports to regional leaders . . ." (Italics added.) The declaration does not explain how Ms. Azevedo came to that conclusion before she had an opportunity to actually observe plaintiff's work.

prepared." She was "shocked" when she found out plaintiff had been "demoted" and replaced by Ms. Vales. Milana Lock averred that plaintiff "was never unprepared when I worked with him in 2016. Rather, based on my personal experience and observations working with [plaintiff], I believe [plaintiff] was as prepared as possible while working within a capital planning process that constantly changed and lacked clarity and direction from Kaiser Permanente's Organizational Leaders. My impression was that everyone involved, including [plaintiff] and myself, struggled with the capital planning process because of the constant changes, disorganization, and lack of clarity and direction from the Kaiser Permanente Organizational Leaders." Finally, plaintiff's former supervisee Lakiesha Timberlake testified in her deposition that she never thought plaintiff was "unprepared." Although defendants point out those employees did not supervise plaintiff, they do not deny those co-workers had direct knowledge of plaintiff's work performance.

Plaintiff's own declaration also brings into question defendants' reasons for the demotion, and defendants point to nothing in the record contradicting any of plaintiff's assertions. For example, plaintiff averred, "The CVSA had been expanding for years in terms of membership. Because of the expansion, the needs of the CVSA were constantly increasing, although resources were not growing commensurately. This included the resources that I had with which to do my job. The capital expansion projects rely heavily upon forecasts. During this time there was uncertainty, lack of clarity on strategic direction, and difficulty for the organization to seek and receive approval for . . . funding for these various critical projects. The lack of clarity and uncertainty of forecasting the capital expansion needs based on membership growth from a regional perspective often caused delays in funding approval . . . ." Plaintiff's observations are generally corroborated by the declaration of

Ms. Lock, quoted in the previous paragraph. Plaintiff also averred that he had not received a replacement for a project manager who had departed, despite his request for a replacement and the increase in workload with growth in demand for additional space. A reasonable trier of fact could conclude plaintiff's explanations are plausible in the totality of the evidence.

Finally, plaintiff presented evidence, uncontradicted by defendants, that plaintiff had substantially more experience than Ms. Vales. He testified in his deposition that Ms. Vales had "zero financial experience, less operational experience, less experience within the realm of space capacity and planning, less collaboration with other leaders in the organization, relationships were not developed." Plaintiff averred that "[i]n or around January 2017" he had trained Ms. Vales "on the following project categories: Space Moves; Offices Expansions or Conversion; Furniture Renovation or Purchase; Beautification; Capital Equipment; Plant Maintenance and Renovation . . .; Medical Office Capacity and Expansion; and, Behavioral Health Office Capacity and Expansion." He testified Ms. Vales was "an executive assistant or consultant" before being promoted to the director position. Defendants may be able to convince a trier of fact they had good reason to replace plaintiff with such a less-experienced employee, but a reasonable trier of fact could conclude Ms. Vales' relative inexperience tends to show defendants demoted plaintiff for a reason other than his ability to do his job.

In summary, the only significant corroboration for the explanations given for plaintiff's demotion is the 2016 evaluation by Ms. Azevedo, but a reasonable trier of fact could conclude that evaluation was tainted by bias, given the other circumstances referenced above. (*Sandell*, *supra*, 188 Cal.App.4th at p. 316.) A reasonable trier of fact could be skeptical of

20

defendants' conclusory assertions of plaintiff's unpreparedness, given the disparity between the 2015 and 2016 evaluations, the opinions of plaintiff's co-workers, and defendants' failure to point to any evidence contradicting the project obstacles identified by plaintiff and Ms. Lock in their declarations. These circumstances alone are sufficient to establish a triable issue as to pretext. (*Guz, supra*, 24 Cal.4th at p. 356 ["In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."]; *Sandell*, at p. 319 ["a reasonable fact finder could conclude that [the defendant's] proffered reasons for terminating [the plaintiff's] employment were unworthy of credence, and, based on that conclusion, infer that those reasons are not the real reasons for [the] termination"].)[13]

III. *The Trial Court Properly Granted Summary Adjudication as to Plaintiff's Constructive Discharge Claim*

Constructive discharge "occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305.) " '[O]ne of the essential elements of any constructive discharge claim is that the adverse working

---

[13] Given that we conclude the evidence disputing defendants' reasons is alone sufficient to create a triable issue as to pretext, we need not and do not address whether plaintiff's showing of pretext finds additional support in declarations from other former Permanente employees who averred that Ms. Azevedo demonstrated age bias. The trial court can address the admissibility of that evidence at trial. (See, e.g., *Sprint/United Mgmt. Co. v. Mendelsohn* (2008) 552 U.S. 379, 388; *Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 871; *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92, 114.)

conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions.' " (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1247 (*Turner*); accord, *Atalla v. Rite Aid Corp.* (2023) 89 Cal.App. 5th 294, 320.)

Plaintiff has not shown a triable issue as to constructive discharge. As we have explained, the evidence supports a finding the demotion materially affected plaintiff's career prospects. Plaintiff's decision to leave Permanente is understandable given the loss of prestige and advancement prospects, as well as his frustration at being demoted based on allegations he believed were false. But plaintiff fails to identify any specific ways in which his actual work conditions were "intolerable." The parties agree the substance of plaintiff's work did not substantially change after the demotion, other than the loss of supervisory responsibilities. To find a triable issue as to constructive discharge in the present case would essentially mean every allegedly unlawful demotion must be treated as a constructive discharge, but plaintiff cites no authority supporting that proposition.[14]

*Simers v. Los Angeles Times Commc'ns, LLC* (2018) 18 Cal.App.5th 1248, is instructive. There, a newspaper demoted a sports columnist to a reporter position after investigation of an alleged ethical breach. (*Id.* at pp. 1250–1251.) The columnist claimed constructive termination and sued. (*Id.*

---

[14] Plaintiff references declarations in which other employees averred they left employment because they found working for Ms. Azevedo intolerable, but he cites no authority he may base his constructive termination claim on any discrimination or harassment suffered by others. Furthermore, his declaration fails to specify what knowledge he had about any such incidents before he resigned, and he avers only that he believed the employment decisions were discriminatory. Plaintiff cites no authority that such evidence is sufficient to raise a triable issue as to constructive termination.

at p. 1251.)  After trial, the trial court granted the defendant's motion for judgment notwithstanding the verdict on the plaintiff's constructive termination claim, but the court denied the motion as to the plaintiff's discrimination claim.  (*Ibid.*)  The court of appeal affirmed, reasoning, "While the evidence allowed the inference that age or disability discrimination was a motivating factor in one or more of defendant's actions, nothing in the conveyance of the criticism, the performance of the investigation, or the resulting demotion and performance plan reflected any 'unusually aggravated' working conditions or the 'continuous pattern of mistreatment' necessary for a constructive discharge.  It is the working conditions themselves—not the plaintiff's subjective reaction to them—that are the sine qua non of a constructive discharge."  (*Id.* at p. 1274; see also *Turner, supra,* 7 Cal.4th at p. 1247 ["a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge"].)

The same reasoning applies in the present case.

IV.    *The Trial Court Properly Granted Summary Adjudication as to Plaintiff's Harassment Claim*

It is unlawful for an employer "because of . . . age . . . to harass an employee."  (Gov. Code, § 12940, subd. (j)(1).)  Plaintiff contends he raised a triable issue of age harassment based on his alleged demotion and his 2016 performance review.[15]  Defendants argue the evaluation and demotion cannot be the basis for plaintiff's harassment claim because they constituted personnel management, citing *Reno v. Baird* (1998) 18 Cal.4th 640 (*Reno*).  We agree.

---

[15] Plaintiff does not argue the trial court erred in rejecting his claim of harassment based on race.

In *Reno*, the California Supreme Court explained, " '[T]he exercise of personnel management authority properly delegated by an employer to a supervisory employee might result in discrimination, but not in harassment. [Citations.] Making a personnel decision is conduct of a type fundamentally different from the type of conduct that constitutes harassment. Harassment claims are based on a type of conduct that is avoidable and unnecessary to job performance. No supervisory employee needs to use slurs or derogatory drawings, to physically interfere with freedom of movement, to engage in unwanted sexual advances, etc., in order to carry out the legitimate objectives of personnel management. . . . We conclude, therefore, that the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. . . . These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment.' " (*Reno, supra,* 18 Cal.4th at pp. 646–647; accord, *Serri v. Santa Clara Univ.* (2014) 226 Cal.App.4th 830, 869–870; see also *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 (*Roby*) ["harassment focuses on situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee"].)

Plaintiff argues his harassment claim nevertheless has merit, quoting *Roby* for the proposition that, "in some cases the hostile message that constitutes the harassment is conveyed through official employment actions,

and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." (*Roby*, *supra*, 47 Cal.4th at p. 708, citing *Miller v. Department of Corrections et al.* (2005) 36 Cal.4th 446, 460–466 (*Miller*).) *Roby* explained, "In *Miller*, we considered whether evidence of widespread sexual favoritism in the workplace could constitute sexual harassment against the nonfavored employees. We concluded that it could, provided that the favoritism was so severe or pervasive as to alter the working conditions. [Citation.] Significantly, the favoritism at issue in *Miller* took the form of official employment actions, including promotions and favorable job assignments given to female employees involved in sexual relationships with a particular male supervisor. [Citation.] The *Miller* plaintiffs, however, were not subject to any demands for sexual favors. [Citation.] In concluding that the plaintiffs had nevertheless stated a prima facie case of harassment in violation of the FEHA, we stated that widespread sexual favoritism could convey a 'demeaning message . . . to female employees that they are viewed by management as "sexual playthings" or that the way required for women to get ahead in the workplace is to engage in sexual conduct with their supervisors or the management.' [Citations.] This demeaning message, we held, could give rise to an actionable hostile work environment." (*Roby*, at pp. 707–708.)

Plaintiff cites no authority he can assert a harassment claim based on the hostile message conveyed by *his own* negative evaluation and demotion, instead of employment actions suffered by others reflecting age bias. Such a rule would swallow the distinction between discrimination and harassment under the FEHA. And, although the evidence of discrimination allegedly experienced by others may be admissible at trial on the issue of pretext (see

*ante*, p. 21, fn. 13), the declarations lack sufficient details to support a finding that any such discrimination created "severe" or "pervasive" harassment for *plaintiff*. (*Miller*, *supra*, 36 Cal.4th at p. 462.) Plaintiff asserts in his declaration that Ms. Azevedo "demoted, forced out, or tried to force out" various persons "because of our respective ages." But the declaration fails to detail pervasive or severe harassment actually observed by plaintiff. Instead, his declaration asserts he believed that certain people that left or were not promoted did not have performance problems, which is not sufficient to show there is a triable issue. (Cf. *Miller*, at pp. 466–468 [plaintiffs were aware of pervasive and severe sexual favoritism].)

We conclude the trial court properly granted summary judgment on plaintiff's harassment claim.

V.    *Plaintiff's Remaining Causes of Action*

The trial court properly granted summary adjudication of plaintiff's race discrimination claim (the first cause of action). Plaintiff's opening brief only makes passing reference to that claim and plaintiff's reply fails to address the arguments regarding the claim in defendants' brief. Plaintiff has failed to present evidence from which a reasonable trier of fact could conclude he was discriminated against on the basis of race.

As to the age discrimination cause of action, defendants argue that this court should affirm summary adjudication to the extent the claim is based on an alleged constructive termination—because there is no triable issue that such a termination occurred. Defendants argue it is proper to grant partial summary adjudication, citing *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, at pages 1854 to 1855, for the proposition that "[A] party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts

26

alleged in the same cause of action."  Plaintiff does not argue to the contrary in his reply brief.  We will affirm summary adjudication of plaintiff's discrimination claim only to the extent it is based on an alleged constructive termination.

As to the fourth cause of action, for associational discrimination, plaintiff did not oppose summary adjudication below and does not raise any issue on appeal.

As to the fifth cause of action, for failure to prevent discrimination and harassment, we reverse because there is a triable issue as to plaintiff's discrimination claim.  We will, however, affirm to the extent the claim is based on alleged failure to prevent harassment.

Plaintiff does not argue the trial court erred in granting summary adjudication as to the retaliation claim (the sixth cause of action), which was asserted only by the other named plaintiff.

Plaintiff concedes his IIED claim (the eighth cause of action) is properly dismissed if the harassment claim is dismissed.  He does not dispute the trial court's conclusion that it is "duplicative of the harassment claim."

Plaintiff does not dispute that he dismissed the ninth and tenth causes of action for breach of express or implied contract and breach of implied covenant of good faith and fair dealing.

Finally, defendants argue that, even if this court reverses the grant of summary judgment as to some of plaintiff's claims, this court should affirm summary adjudication of plaintiff's request for punitive damages.  In particular, defendants argued in their brief on appeal that plaintiff's request fails because plaintiff "failed to raise a triable issue whether [Ms.] Azevedo was an officer, director or managing agent" and because plaintiff "failed to raise a triable issue whether [Ms.] Azevedo's alleged acts rise to the level of

27

oppression, fraud or malice."  Plaintiff failed to address defendant's arguments in his reply on appeal, but he did address the arguments in his briefing below.  Among other things, he pointed out that, according to Ms. Azevedo's curriculum vitae, while at Permanente she "Provide[d] executive leadership for highly complex, fully integrated healthcare organization; $400+ million budget oversight, 2,000+ employees, eight sites across a 70 mile radius in four distinct cities."  There is a triable issue whether Ms. Azevedo "exercised substantial discretionary authority over decisions that resulted in an 'ad hoc formulation of policy.'"  (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 571; see also *id.* at p. 577 ["zone manager . . . responsible for managing eight stores, . . . and at least sixty-five employees" was a managing agent].)  There is also a triable issue whether Ms. Azevedo's conduct constituted "malice or oppression."  (*Scott v. Phoenix Sch., Inc.* (2009) 175 Cal.App.4th 702, 717.)  For example, although the alleged wrongful demotion itself would not be sufficient to sustain such a finding, evidence that Ms. Azevedo "engaged in a program of unwarranted criticism to justify" the demotion could support such a finding.  (*Ibid.*)  Accordingly, we will reverse summary adjudication of the request for punitive damages.

## DISPOSITION

The trial court's judgment is reversed as to the second cause of action, except to the extent it is based on an alleged constructive termination; the fifth cause of action, except to the extent it is based on an alleged failure to prevent harassment; and the request for punitive damages.  The court's judgment is otherwise affirmed.  The matter is remanded for further proceedings consistent with this opinion.  Plaintiff is awarded his costs on appeal.

SIMONS, Acting P.J.

We concur.

BURNS, J.
CHOU, J.

(A165273)